**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**HAGEN CONSTRUCTION, INC.,**

    **Plaintiff**

    **v.**

**WHITING-TURNER CONTRACTING
    CO.,**

    **Defendant**

**CIVIL NO. JKB-18-1201**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM**</u>

*I.  Background*

Initially filed in New Jersey state court, this lawsuit was brought by Plaintiff Hagen Construction, Inc. ("Hagen"), against Defendant Whiting-Turner Contracting Co. ("W-T") after Hagen had served as a subcontractor on the construction of Nemours – Alfred I. DuPont Hospital for Children Outpatient Center (the "Project") in Deptford, New Jersey.  (Compl., ECF No. 1-1.) The case was removed to the United States District Court for the District of New Jersey which granted a change of venue to this Court based on a forum selection clause in the subcontract. (Notice of Removal, ECF No. 1; Order, Apr. 24, 2018, ECF No. 32.)

Hagen's complaint contains three counts:  Count I, breach of contract; Count II, violation of New Jersey's Prompt Pay Act; and Count III, unjust enrichment.  The case has proceeded through discovery and the filing of W-T's motion for partial summary judgment as to Hagen's labor inefficiency claim, which is part of Count I.  (W-T's Mot. Partial Summ. J. ("W-T's Mot."), ECF No. 55.)  The motion has been briefed (ECF Nos. 62, 64) and is ready for decision. Hagen has also filed a motion for leave to file a surreply (ECF No. 66), and that, too, has been

briefed (ECF No. 67) and is ripe. No hearing is required. Local Rule 105.6 (D. Md. 2018). W-T's motion will be granted, and Hagen's motion will be denied.

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III. Governing Documents

Two documents govern the Court's analysis of W-T's motion. The first is the Subcontract signed by both parties. (W-T's Mot. Ex. 2, ECF No. 55-6.) The second is the

Subcontractor's Partial Release Waiver of Lien and Affidavit, attached as Exhibit I to the Subcontract and made a part thereof. (ECF No. 55-6 at p. 49 (for this document, the Court utilizes the pagination generated by CM/ECF).)

In the Subcontract are several pertinent provisions:

- ARTICLE 5. **PAYMENT**—
  . . .

    (b) . . . As a condition precedent to the payment of any application, the Subcontractor shall (1) produce waivers of mechanics lien rights and claim releases in the form required by Contractor by Subcontractor and all persons supplying labor or materials to the Subcontractor on the Project through the period covered by the application, or (2) exhibit such other evidence as the Contractor may require that charges for all labor and material have been paid.

    . . .

- ARTICLE 6. **ADDITIONAL OR OMITTED WORK**—

    (a) In the event that the Contractor directs Subcontractor to perform additional work, Subcontractor agrees that it will promptly perform and diligently complete such work whether or not Contractor and Subcontractor have agreed on the cost of such work. Subcontractor shall submit to Contractor a lump sum proposal for such work, which proposal shall include a detailed cost breakdown for each component of the work, indicating both quantities and unit prices, and such proposal shall be submitted to Contractor not later than 7 days after Contractor directs Subcontractor to perform extra or additional work or such lesser period if required by the Contract between Owner and Contractor. If a lump sum price or unit price for the additional work cannot be agreed upon, or Subcontractor fails to submit such proposal within 7 days after Contractor directs Subcontractor to perform extra or additional work, Subcontractor agrees to do the work on the basis of its actual cost plus percentage fees for overhead and profit as set forth in Article 10. The Contractor shall not be liable for payment for any additional work performed by the Subcontractor unless such work is first expressly authorized by the Contractor in writing and payment is made by the Owner to the Contractor for such extra work, payment by Owner to Contractor being a condition precedent for Contractor to pay Subcontractor for such work. Both authorization in writing by the Contractor and actual payment by the Owner to the Contractor for such extra work shall be conditions precedent to Contractor's obligation to pay Subcontractor for such additional work. Any additional compensation or time to be given to Subcontractor shall be set forth in a Subcontract supplement and shall constitute a full and final equitable adjustment of compensation, time or any other alleged entitlement, known or unknown, arising in connection with the facts and circumstances described in and which gave rise to such contract supplement and Subcontractor waives all damages, direct, indirect and consequential, relating to such facts and circumstances, including, but not limited to,

impact, reduced productivity, interference by other trades, lack of coordination of the work by Contractor, inefficiencies, acceleration, delays, extended overhead, diminished bonding capacity or lost profits.

. . .

(d) In the event of any dispute, controversy, or claim for additional compensation or time extensions, except for payment for extra or additional work expressly directed by Contractor in accordance with Section 6 (a) of this Subcontract, the compensation for which shall be fully and finally governed by Section 6 (a) of this Subcontract and for which no further claim can or shall be made, notice in writing shall be given to the Contractor no later than seven (7) days following the occurrence on which such claim is based, unless the notice provision in the General Contract between the Owner and Contractor is less than seven (7) days, in which case, Subcontractor shall give notice to Contractor within 2 days less than the time required for Contractor to give notice to the Owner according to the notice provision in the General Contract. Such notice shall describe the dispute, controversy or claim in detail so as to allow Contractor to review its merits. Such notice shall also provide detailed information to substantiate such claim including supporting documentation and calculations, and including any information requested by Contractor. Any claim not presented within such time period shall be deemed waived by Subcontractor.

. . .

- ARTICLE 8. **RELEASES OF CLAIMS AND WAIVER OF LIENS**—

Subcontractor agrees to provide to Contractor, and to provide and obtain from its subcontractors and suppliers of all tiers, executed releases of claims and/or waivers of liens and lien rights in the form required by Contractor and at such times as may be requested by Contractor.

The Subcontractor's Partial Release Waiver of Lien and Affidavit provided in pertinent

part:

The undersigned Subcontractor, in consideration of the payments previously made and payment for the period covered by the current invoice set forth above, hereby waives and releases all mechanic's, materialman's or other liens and, to the fullest extent permitted by law, all rights to file any such liens in the future, and all claims and demands against Contractor, Owner, their sureties and the real property on which the project is located, in any manner arising out of work, labor, services, equipment or materials, performed or furnished by Subcontractor, its subcontractors, and suppliers, in connection with the Project and subcontract, through the period covered by the current invoice and all previous invoices. The release does not apply to retention, nor to extra work

which Subcontractor has been authorized to proceed with by the Contractor, but for which payment has not yet been approved.

Except as noted below, Subcontractor acknowledges and represents that for the period and work covered by all previous invoices for which Subcontractor has received payment:

l.      Subcontractor has paid in full all amounts for subcontract, labor, materials and rented equipment.

2.      Subcontractor has properly applied previous payments to pay all outstanding invoices related to the Project.

3.      Subcontractor is aware of no claims nor any circumstances that could give rise to any future claims against Contractor, Owner, Architect or other Subcontractor on the Project.

4.      All payroll, withholding, sales and other taxes, union benefits, insurance premiums and any other amount required by law, regulation or agreement to be paid in connection with labor, materials, and equipment for the Project have been paid in full.

List exceptions, if any:

. . .

I hereby certify, under penalties of perjury, that the facts, information and representations set forth above are true and accurate to the best of my knowledge, information and belief.

BY: _____
            *(Name of Subcontractor)*
BY: _____
            *(Signature, Printed Name and Title)*, Duly Authorized Agent of Subcontractor

## IV. Evidence

The Subcontract under which Hagen agreed to provide the labor and materials required to complete the drywall and rough carpentry for the Project was executed on or about July 29, 2015. (Subcontract 9.) (Although Hagen and W-T also executed another agreement in January 2016 for Hagen to complete millwork and casework installation on the Project, only the drywall subcontract is at issue in this case.) The amount to be paid to Hagen under the Subcontract was $2,400,000; in addition, pursuant to Article 10 of the Subcontract, W-T agreed

to pay Hagen its actual costs and certain percentage fees for overhead and profit for extra work authorized in writing under Article 6.  (Subcontract 8.)

According to Rebecca Reeves, W-T's project manager for the Project, Hagen began work under the Subcontract in September 2015 and achieved substantial completion of its work by June 30, 2016.[1]  (Reeves Decl. ¶ 13, W-T's Mot. Ex. 1, ECF No. 55-5.)  For each progress payment application on the Subcontract, Hagen submitted a signed Partial Release Waiver of Lien and Affidavit ("Partial Release").  (*Id.* ¶¶ 14-16.)  Hagen submitted a total number of 16 payment applications and Partial Releases.[2]  (*Id.*)  On none of the Partial Releases did Hagen list any exceptions.  (*Id.* ¶ 18.)  In the first payment application numbered "14," which covers the time period after May 31, 2016, and up to August 31, 2016, Hagen certified it was 100% complete with its original work under the Subcontract.  (*Id.* ¶ 20; Payment App'n 14, W-T's Mot. Ex. 4, ECF No. 55-8 at pp. 95-101 (using CM/ECF pagination).)  Four additional payment applications were submitted after that one, with dates of October 31, 2016 (the second application numbered "14"), November 30, 2016 (application numbered "15"), November 30, 2016 (application numbered "16"), and February 28, 2017 (application numbered "17").  (*Id.* Ex. 4, ECF No. 55-8 at pp. 102-29.)  Reeves states the latter four payment applications "requested payment for additional work subject to bilaterally executed contract supplements and the release of retention."  (Reeves Decl. ¶ 22.)  Reeves states W-T paid Hagen in full for applications numbered 1-17.  (*Id.* ¶ 19.)

---

[1] The first two payment applications preceded September 2015, indicating some work must have occurred before September 2015.  It is noted, however, that the amounts of the first three applications were, generally, a good bit smaller than the payment applications from October 31, 2015, onward.

[2] Reeves indicates the numbering of the payment applications is not sequential in some instances, "and there are duplicate numbers due to the parties' contemporaneous revisions of and combination of certain draft payment applications."  (Reeves Decl. ¶ 17.)  Thus, no payment application is numbered "12" or "13," and two payment applications are numbered "14."  (*Id.* ¶ 16.)

Reeves states, "Throughout the summer of 2017, W-T and Hagen were negotiating close-out of the several open Hagen change order requests which totaled $123,499 and did not include any labor inefficiency claims and several W-T backcharges against Hagen (the 'Open Items')." (*Id.* ¶ 24.)  The Court interprets this statement as indicating W-T and Hagen were negotiating during the Summer of 2017 the settlement of several open Hagen change order requests and several W-T backcharges against Hagen; further, the Court interprets Reeves's statement to mean the open Hagen change order requests did not include any labor inefficiency claims.

On May 12, 2017, Reeves emailed George Jackson, who was Hagen's project manager on the Project, and attached a copy of W-T's "logs showing all open items at this time."  (W-T's Mot. Ex. 7, ECF No. 55-11.)  She also said,

> With regards to the "Rejected" log, the majority of these items are items that were submitted to Nemours through the change order process and returned "not approved".  We will need to review each item in detail to resolve how they will be addressed.  Additionally, the Pending log is a list of open/pending backcharges.  I will compile the back-up for the miscellaneous issues and send that to you in a separate email.  . . .
>
> . . .
>
> At this point, I'd like to get through everything that we can to issue a contract supplement early next week, even if there are still a few items, including the HSJ charges that are not yet finalized.
>
> Please review and let me know your availability to discuss next week.  . . .

(*Id.*)

> Jackson responded the next day,
>
> Rebecca there is a lot of rejected and partial payments that we need time to go through and identify what is happening and where.  I would like some time to review and then perhaps a meeting to try and resolve?  There is a lot to go through over the phone.  Let me know what you think.  Thank you.

(*Id.*)

On May 17, 2017, Reeves responded,

I will likely put a supplement together of the approved items to get those cleaned up. Please let me know some dates that you may be available to review—I want to get something on our calendars before we both get booked up.

(*Id.*)

On June 1, 2017, Jackson emailed Reeves and said,

Rebecca please review the attached response from Hagen Construction. At this point Rebecca we are looking to get a final change order and simply move on with some recognition of our efforts. We can meet to discuss if you would like but we believe the attached is fair for what we have been through on this project. Anything falling short of this mark will need to be resolved at a different level. Please contact us to discuss further. Thank you.

(*Id.*)  Attached to Jackson's email message was a log entitled "Change Order Resolution" in which he provided comments to Reeves's proposed resolution of change order requests and backcharges, noting those with which Hagen either agreed, agreed after modification, or disagreed. (*Id.*)  In his deposition, Jackson was asked about this log; specifically, W-T's counsel posed the question, "Now, in these logs is there any inefficiency claim identified being asserted by Hagen Construction?" (Jackson Dep. 129:3-4, W-T's Mot. Ex. 5, ECF No. 55-9.)  Jackson responded, "No, there is nothing on here for the COR on that." (*Id.* 12:5-6.)

Jackson was asked in his deposition, "Were there any delays or impacts to Hagen, it bases its inefficiency claim on, after June 30, 2016?" (*Id.* 74:5-6.)  He answered, "Not that I can remember or that I am aware of." (*Id.* 74:7.)  He was also asked, "So as of June, say the end of June 2016, Hagen would have been aware of those events that would have given rise to impact to their performance relating to these items that you identify. Is that correct?" (*Id.* 80:6-9.)  He answered, "Yes." (*Id.* 80:10.)  In response to the question, "Did Hagen submit a Change Order Request relating to those items?," Jackson said, "Not at that time. No." (*Id.* 80:11-13.)  A few moments later, W-T's counsel asked him, "My question is specific though, whether Hagen

submitted a change order request for those items?," and Jackson responded, "No, we did not." (*Id.* 80:22-24.)

Patti Ford, Hagen's accounts receivables manager, signed payment applications 10 through 17 and their accompanying Partial Releases. (W-T's Mot. Ex. 4.) In her deposition, she acknowledged no exceptions had been noted on the Partial Releases she had signed. (Ford Dep. 19:13—30:9, W-T's Mot. Ex. 6, ECF No. 55-10.) When asked if she had been aware of an inefficiency claim that Hagen was asserting on the Project, she responded in the negative. (*Id.* 26:21-23.) She testified that neither Jackson nor Hagen's president, Alfred Hagen, had communications with her about claims Hagen was asserting against W-T on the Project. (*Id.* 27:8-23.)

On August 14, 2017, Reeves sent an email message to Jackson proposing resolution of outstanding amounts:

> Hi George-
>
> As discussed, we have resolved the outstanding items with Nemours which now allows us to work toward a final resolution of your Subcontract change orders and amount.
>
> Based on our discussion this morning, below is Whiting-Turner's proposed close out value:
>
> $63,615.26 - Open Approved Change Order Requests
> $50,065.00 - Previously Rejected Change Order Requests
> -$902.50 - PCO #331/COR #135 Hagen agrees to split value of rejected change per response 6/1/17
> -$1,011.00 - PCO #33/ COR #137 Hagen agrees to split value of rejected change per response 6/1/17
> -$828.00 - PCO #424/COR #194 Hagen agrees that this change may be rejected per response 6/1/17
> -$439.00 - PCO #412/Tru-Fit Backcharge - Hagen agrees to this backcharge per response 6/1/17
> -$1,283.50 - PCO #476/Union Roofing Backcharge - Hagen agrees to portion of backcharge per response 6/1

-$3,161.00 - PCO #255/COR #86 - Issue not properly submitted/documented, tickets submitted well after work in field completed without proper notification

-$2,345.00 - PCO #255/COR #87 - Issue not properly submitted/documented, tickets submitted well after work in field completed without proper notification

-$29,846.86 - PCO #320 - Firestopping Backcharge, Value reduced based on request to utilize Hagen contract rates despite actual Invoices/costs being submitted. Additionally, no W-T supervision/coordination time has been charged associated with this work which was documented to be deficient by Hagen Construction.

-$26,844.00 - PCO #447 - HSJ Additional Costs associated with excessive door/hardware punchlist and numerous backchecks performed due to deficient work. Costs are associated with additional HSJ visits on 9/14-9/15, 10/24 and 11/16. Following each visit an updated punchlist or field visit report was issued by HSJ. These charges do NOT include any of the additional HSJ visits, calls, or work associated with the door clip issue.

Net Final Subcontract Supplement = $47,019.40

Please review these values and confirm that this is acceptable so that we can issue a final Subcontract Supplement.

Thank you.
Rebecca

(W-T's Mot. Ex. 8, ECF No. 55-12.) According to Reeves, the complaint filed in the instant case was the first notification to W-T of the labor inefficiency claim. (Reeves Decl. ¶ 27.) The lawsuit was filed August 2, 2017, and served on W-T August 10, 2017. (Compl., ECF No. 1-1.)

Alfred Hagen testified in his deposition that the company "certainly shared [with W-T] throughout the project the fact that the project inefficiencies were impacting our ability to execute, have a Draconian impact on the job." (A. Hagen Dep. 75:2-5, W-T's Mot. Ex. 9, ECF No. 55-13.) In response to the question, "Did you provide [W-T] with the substantiation, the detailed analysis of your inefficiency claim before filing the lawsuit?," he responded, "I don't believe so." (*Id.* 75:11-14.)

Jackson's Declaration is also before the Court. (Jackson Decl., Hagen's Opp'n Ex. 2, ECF No. 62-2.) In it, he states,

WT attempted to mitigate the initial Project delays, design changes, and other disruptions by resequencing and accelerating Hagen's work.

(*Id.* ¶ 25.)

By resequencing Hagen's work and deviating from the contractually agreed-upon schedule, WT forced Hagen to work in an impacted and inefficient environment.

(*Id.* ¶ 26.)

Hagen notified WT—both orally and in writing—of the impacts and inefficiencies to its work throughout the course of the Project.

(*Id.* ¶ 28.)

Hagen's notice took the form of conversations on the Project floor and in meetings, as well as in writing via emails, letters, and other paperwork, including meeting minutes.

(*Id.* ¶ 29.)

Hagen also notified WT of numerous issues with the Project's design documents, inefficient field conditions and obstructions to Hagen's work, and issues with the work of WT's other subcontractors, all of which were impacting the efficiency of Hagen's base scope of work.

(*Id.* ¶ 37.)

I discussed impacts to Hagen's work with WT's project manager, Ms. Rebecca Reeves, on nearly a weekly basis throughout the Project—both in person at Project meetings and telephonically.

(*Id.* ¶ 42.)

Ms. Reeves acknowledged issues and impacts to Hagen's work but, nevertheless, instructed Hagen to prosecute its work as directed by WT.

(*Id.* ¶ 43.)

Despite Hagen's continual notice of the impacts to, and inefficiencies in the prosecution of, its work, WT never sought additional information or documentation relating to the impacts and inefficiencies.

(*Id.* ¶ 44.)

WT never demanded that Hagen provide a detailed breakdown or calculation of its cost overruns.

(*Id.* ¶ 45.)

WT never requested that Hagen submit a formal change order request.

(*Id.* ¶ 46.)

WT never asserted that Hagen failed to give proper notice under the Subcontracts.

(*Id.* ¶ 47.)

WT never claimed that Hagen waived its rights to seek compensation for its labor inefficiencies.

(*Id.* ¶ 48.)

Instead, during a telephone conversation regarding the negotiation of Hagen's change order requests and labor inefficiency claim, WT—and in particular, Ms. Reeves—represented to me that WT knew Hagen was suffering losses due to the design issues and inefficiencies on the Project, as was WT, and that WT would work with Hagen and "treat Hagen fairly."

(*Id.* ¶ 49.)

Throughout the course of the Project, Hagen requested additional compensation for a series of added work items for which Hagen has not yet been paid.

(*Id.* ¶ 50.)

WT departed from and waived the notice and change order procedures otherwise required by the Subcontracts by not demanding strict compliance with such contractual provisions and approving a substantial amount of Hagen's additional work items which remain unpaid and in dispute.

(*Id.* ¶ 51.)

Alfred Hagen also provided a declaration to the Court. (A. Hagen Decl., Pl.'s Opp'n Ex. 15, ECF No. 62-15.) His declaration repeats some of the statements in Jackson's declaration about the company's notifications given orally and in writing to W-T regarding impacts and inefficiencies to Hagen's work. (*Id.* ¶¶ 12-15.) He also states he met with Reeves on at least

three occasions and, each time, informed her of impacts causing inefficiencies in Hagen's work. (*Id.* ¶ 17.)  Further, during one of those meetings, he "advised Ms. Reeves that Hagen estimated it would sustain approximately $750,000 in losses on the Project as a result of the numerous design issues, Project mismanagement, and related chaos on the Project."  (*Id.* ¶ 18.)  Reeves, he states, "represented to [him] that WT knew Hagen was suffering losses due to the design issues and inefficiencies on the Project, as was WT, and that WT would work with Hagen on its additional costs incurred as [a] result of the extra work and inefficiencies."  (*Id.* ¶ 24.)  He made other statements in his declaration:

> . . . Hagen reasoned that the lien releases it signed throughout the course of the Project did not apply to waive any of its extra work and inefficiency claims because it could not be claimed in a lien under New Jersey's lien law anyway.

(*Id.* ¶ 25.)

> After substantial completion in June of 2016 through the first half of 2017, Hagen attempted to negotiate closeout of its Subcontracts and open additional work items with WT in good faith and based upon WT's promise to work with Hagen.

(*Id.* ¶ 28.)

Additionally, Alfred Hagen stated that the initial negotiations took place between Jackson and Reeves, but when those "broke down," he spoke with James Martini, a senior vice president of W-T, and discussed "Hagen's retainage, its unpaid change order requests, and its loss of production due to the inefficient manner in which WT managed the Project."  (*Id.* ¶¶ 29-31.)  Martini's final offer was that "WT would pay Hagen in full for its unpaid change orders in order to close out the Project and Hagen's claims for extra compensation, but [Alfred Hagen] rejected Mr. Martini's proposal and this suit ensued."  (*Id.* ¶ 32.)

Hagen has provided, as supporting evidence of its position, copies of two email messages and a letter sent by Hagen to W-T.  The first email message is dated November 5, 2015, and was

sent by Rick Jankowski to Reeves, Jackson, Joe Lenker, and Chris Issa.  It has a letter attached. (Pl.'s Opp'n, Ex. 11, ECF No. 62-11.)  In the letter, Jankowski complains to Reeves about another subcontractor, Thomas Mechanical, which had damaged some of the walls erected by Hagen.  Jankowski tells Reeves, "I without complaint, spent 32 man hours fixing his destruction. . . ." (*Id.*)  Jankowski asked that Thomas Mechanical be required to cooperate so that Hagen's work does not have to be repeated or repaired.  (*Id.*)  He also said, "If W/T wishes framing to cease, please inform George [Jackson] immediately in writing.  If not, please get Thomas on board with what we, as a team, are trying to accomplish." (*Id.*)

The second email is dated April 28, 2016, and was sent by Jankowski to Reeves and Jackson.  (*Id.* Ex. 12, ECF No. 62-12.)  The subject line is "Second floor," and Jankowski states, "I can't install millwork/ finish ceilings with this in my way…..why was Nemours allowed to load this building?"  (*Id.*)  Attached are two pictures showing large boxes under unfinished ceilings.  (*Id.*)

The letter is dated February 6, 2016, and was sent by Jackson to Reeves.  (*Id.* Ex. 13, ECF No. 62-13.)  In his letter, Jackson complains to Reeves that certain things have not been done to allow Hagen to fully install drywall, as opposed to "piece meal . . . drywall installation [which] . . . has a gross negative impact to our productivity."  (*Id.*)  Jackson also referred to the north elevation siding installation and says,

> 4) . . . We experienced a gross negative impact to our productivity by having to return to sections of exterior wall several times in order to complete the siding installation. The south elevation still has a section of siding left out awaiting direction on how the concrete bench interacts with the siding and flashing details. To our knowledge we do not currently have this information.
>
> We currently have 26 men on this project, 20 carpenters, 4 tapers, and 2 laborers as of Thursday 2/4/16.  We can only proceed as fast as the trades in front of us. Hagen Construction is committed to doing everything we can to help meet the

completion date for the project.  However we cannot pay for the privilege of doing so by working in a nonproductive manner.  Jumping around the project and going back to areas that should be completed with a single mobilization are costing us resources we do not have in the project.  Again we are attempting to keep things on track by installing drywall one side and hopping up and down on the south and west siding installation.  Moving forward we need to be able [to] complete tasks in a productive manner.

Please contact our main office if you need to further discuss this matter.  Thank you.

(*Id.*)

Also before the Court are Daily Logs submitted by Hagen to W-T during the time when work was in progress under the Subcontract.  (*Id.* Ex. 9, ECF No. 62-9.)  These have shorthand notations that indicate, *inter alia*, problems encountered in the Project.  For example, the Daily Log for September 25, 2015, has the following notation under "Issues, Hold-ups & Delays":

> Waitng [*sic*] on level 2 parapet elevations...... 8 days, rfi came back without elevations
> North elevation from 1 to 3 line, had to add stand off studs, clips didn't reach CFMF due to building being out of skew 1 l/4"
> Need west elevation louver size
> HM frames
> West elevation clip change
> Need incorrect cue deck changed for top track....

(*Id.* at p. 3 (utilizing CM/ECF pagination).)

Another example is the Daily Log for October 28, 2015, showing the following notation under "Issues, Hold-ups & Delays":

> East elevation tube steel conflicts with arch drawings for height
> Eyebrow wall at 7.6 line steel conflicts with arch drawings
> Pool area windows....no storefront supports similar to RFI #127
> HM frames
> North tube steel plate.......19 days
> 5 line bent plate.....8 days
> Change in parapet height again on high roof over Areas A and B
> Control line issue on Level 2

(*Id.* at p. 15.)

The Daily Logs also show "Tasks Performed Today." For September 25, 2015, the following notation was made:

> Misc safety work level 2
> North elevation CFMF

(*Id.* at p. 3.) And for October 28, 2015, the Daily Log showed the following:

> Interior framing level 1, areas A and B
> CFMF Level 1, North elevation Area C
> Layout, top track, framing Level 1 Electrical/Mechanical rooms

(*Id.* at p. 15.)

Another Daily Log for February 8, 2016, showed "Issues, Hold-ups & Delays" as the following:

> No plumbing inspection L2......cannot drywall
> No electrical inspection L1C......can only l side, cannot close up
> No electrical inspection stair towers......stopped, cannot drywall
> No painter onsite......no reason given
> Fitters still welding pipe L2A.....cannot drywall
> Plumbers, electricians holding up multiple phases
> Grid starting 2/11/2016 with or without paint

(*Id.* at p. 18.) And the "Tasks Performed Today" for the same day are listed as follows:

> Frame soffits L1C
> In wall blocking L1C
> Z bar block walls main entry and stone wall
> Patch in Z bar, alum, ins L2 west
> Finish siding L2 west
> Start flashings noth [*sic*] elevation L1
> Spray sound sealant L1A
> Shoot ceiling wires Ll
> Drywall stair B Ll...stopped by Joe
> Frame columns L2
> Top off L2
> Shaftwall Elev A, L2
> In wall blocking L2A
> Tapers....sand L1B, Coat L1A
> Clean up

(*Id.*)

16

## V. Analysis

W-T has asserted three reasons why it is entitled to judgment in its favor on Hagen's labor inefficiency claim. *First*, W-T says Hagen failed to provide timely notice and substantiation for the labor inefficiency claim as required by the Subcontract. *Second*, W-T contends Hagen's labor inefficiency claim is barred by Hagen's execution of releases in which it released all claims against W-T and represented it was not aware of any claims or occurrences giving rise to future claims through a time period well beyond the dates of the events purportedly giving rise to the labor inefficiency claim. *Third*, the labor inefficiency claim is a delay claim and is barred by the Subcontract's "no damages for delay" clause. (W-T's Mot. Supp. Mem. 13.) Although the Court finds no merit to the third argument, it concludes W-T is correct as to its first and second arguments.

Because Maryland law governs the interpretation of the Subcontract, the Court relies upon Maryland's familiar principles of contract construction.

> Maryland adheres to the principle of the objective interpretation of contracts. If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation.

*Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007). Furthermore,

> A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

*Sagner v. Glenangus Farms*, 198 A.2d 277, 283 (Md. 1964), *quoted in Cochran*, 919 A.2d at 710. Finally,

> Where the contract comprises two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect.

*Rourke v. Amchem Products, Inc.*, 863 A.2d 926, 941 (Md. 2004).

### A. *Notice and Substantiation for the Labor Inefficiency Claim*

The Court starts with the unarguable proposition that Hagen's labor inefficiency claim is a claim or demand upon W-T. More specifically, it is a claim or demand for reimbursement of costs beyond those Hagen anticipated under the Subcontract based on W-T's alleged mismanagement of the Project, thereby causing Hagen to repeat work it had already done or to start, stop, and return to work in various areas multiple times because Hagen was not afforded unimpeded access to those areas according to the Project schedule and because it was not provided in a timely fashion with materials and information required to perform its work on the Project. Hagen's allegations plausibly establish the basis for a labor inefficiency claim, but it must be decided whether the claim may be properly asserted in this lawsuit.

For any work beyond the established scope of the Subcontract, two ways were provided in the Subcontract for Hagen to seek reimbursement. The first method is set forth in subsection *a* of Article 6. There, the Subcontract addresses the potential for compensation for extra or additional work required by W-T. In the event W-T directed Hagen to perform additional work, Hagen agreed it would "promptly perform and diligently complete such work whether or not [W-T] and [Hagen] have agreed on the cost of such work." (Subcontract 3.) Either Hagen could submit a lump sum proposal for the work, including "a detailed cost breakdown for each component of the work, indicating both quantities and unit prices" no later than seven days after W-T directed Hagen to perform the extra or additional work, or, if a price could not be agreed upon, then Hagen would undertake the work "on the basis of its actual cost plus percentage fees for overhead and profit as set forth in Article 10." (Subcontract 3-4.) Regardless of which pricing mechanism prevailed in a particular instance, the Subcontract was unequivocal that W-T

would not be liable to Hagen for payment for additional work "unless such work is first expressly authorized by [W-T] in writing and payment is made by the Owner to [W-T] for such extra work . . . . Both authorization in writing by [W-T] and actual payment by the Owner to [W-T] for such extra work shall be conditions precedent to [W-T's] obligation to pay [Hagen] for such additional work." (Subcontract 4.) The "writing" contemplated under subsection *a* of Article 6 is described as "a Subcontract supplement," although it is possible other "writings" would satisfy Article 6(a). Such a supplement

> shall constitute a full and final equitable adjustment of compensation, time or any other alleged entitlement, known or unknown, arising in connection with the facts and circumstances described in and which gave rise to such contract supplement and Subcontractor waives all damages, direct, indirect and consequential relating to such facts and circumstances, including, but not limited to, impact, reduced productivity, interference by other trades, lack of coordination of the work by Contractor, inefficiencies, acceleration, delays, extended overhead, diminished bonding capacity or lost profits.

(*Id.*)

No evidence before the Court shows that the additional work claimed by Hagen as caused by labor inefficiencies is the subject of a Subcontract supplement or any other "writing" constituting W-T's express authorization in writing of such additional work. Thus, Hagen's labor inefficiency claim does not properly lie under subsection *a* of Article 6.

The second method provided by the Subcontract for reimbursement of additional or extra work is set forth in subsection *d* of Article 6. Subsection *d* also requires a writing:

> In the event of any dispute, controversy, or claim for additional compensation or time extensions, except for payment for extra or additional work expressly directed by Contractor in accordance with Section 6 (a) of this Subcontract, the compensation for which shall be fully and finally governed by Section 6 (a) of this Subcontract and for which no further claim can or shall be made, notice in writing shall be given to the Contractor no later than seven (7) days following the occurrence on which such claim is based . . . . Such notice shall describe the dispute, controversy or claim in detail so as to allow Contractor to review its merits. Such notice shall also provide detailed information to substantiate such

claim including supporting documentation and calculations, and including any information requested by Contractor. Any claim not presented within such time period shall be deemed waived by Subcontractor.

(Subcontract 4.)

Although it is clear that Hagen frequently, and apparently justifiably, complained to W-T about problems preventing Hagen from executing its work in an efficient manner, the Court can find no writing in the record that constitutes an actual claim by Hagen for compensation by W-T, that "provide[s] detailed information to substantiate such claim including supporting documentation and calculations," and that was submitted within seven days of any occurrence upon which a claim could be based. The closest that Hagen comes to meeting that contractual standard is the letter attached to the November 5, 2015, email message by Jankowski to Reeves that referred to 32 man hours spent by Jankowski in the prior week repairing damage to Hagen's framing caused by another subcontractor. But even that seems more in the nature of an expression of frustration and a request for W-T to rein in a renegade subcontractor rather than a request for reimbursement; the letter simply does not make a claim against W-T for the 32 man hours. General complaints by Hagen that W-T mismanaged the project do not constitute "claims." No evidence of a claim within the scope of subsection *d* of Article 6 can be found in the record.

Hagen counters by arguing that W-T waived the requirement of compliance with Article 6, either subsection *a* or *d*, "by not demanding strict compliance with such contractual provisions and approving a substantial amount of Hagen's additional work items which remain unpaid and in dispute." (Pl.'s Opp'n 11-12, citing Jackson Decl. ¶ 51.) But Jackson's conclusional statement in his declaration to that effect does not suffice for factual evidence that W-T, in fact, waived the Subcontract's requirement of compliance with its terms. Hagen has

provided no evidence of any occasion when W-T reimbursed Hagen for work outside of a duly submitted payment application or change order request.

Hagen's opposition response also suggests that Reeves's statement that W-T would "treat Hagen fairly" amounted to a waiver of compliance with the Subcontract's notice and substantiation provisions. (Pl.'s Opp'n 17.) The Court presumes Reeves made such a statement, but finds nothing in it that constitutes a waiver. Reeves's statement is, after all, consistent with compliance with the Subcontract's terms. Thus, *if* Hagen provides proper and timely notice of a claim, then W-T will treat Hagen fairly. Nothing Reeves allegedly said obviates the need for Hagen to give proper and timely notice first, however. Hagen analyzes this argument according to principles of equitable estoppel, citing the case *P Overlook, LLLP v. Bd. of Cty. Comm'rs of Washington Cty.*, 960 A.2d 1241, 1254 (Md. Ct. Spec. App. 2008). (*See* Pl.'s Opp'n 18.) But that case does not support Hagen's argument. As Hagen points out, an essential element of equitable estoppel is whether the plaintiff relied upon the defendant's voluntary conduct to plaintiff's detriment by changing his position for the worse. *Id.* Hagen has produced no evidence that Reeves's promise to "treat Hagen fairly" caused Hagen to change its course of conduct, much less to change its course of conduct to its detriment. Jackson's Declaration indicates this promise occurred in the Spring and Summer of 2017 when Hagen had already finished its work under the Subcontract and the parties were negotiating the close-out. (Jackson Decl. ¶ 49.) But the Court, in viewing the evidence most favorably to Hagen, will assume for the sake of argument that the statement was made at an undefined time while Hagen was still performing its work under the Subcontract. Hagen asserts it continued to work on the project "while incurring enormous expenses to complete the Project in a timely fashion" and that fact establishes detriment to Hagen. Its assertion is unconvincing since Hagen has provided no

evidence it intended to do something other than continue to work on the Project. Consequently, Hagen's evidence does not satisfy an essential element of equitable estoppel.

The Court notes Hagen has also relied upon the undersigned's prior opinion in *Carter Concrete Structures, Inc. v. Whiting-Turner Contracting Company*, Civ. No. JKB-15-1330 (Mem. Mar. 4, 2016, ECF No. 30), for its observation regarding W-T's failure in that case to raise the issue of timely notice in the parties' presuit negotiations, and how that fact supported Carter Concrete's contention that its compliance with its contractual obligation to provide notice was not properly raised by W-T in the suit itself. (Pl.'s Opp'n 16-17.) The short answer to Hagen's argument—that W-T's presuit failure to raise the issue of timely notice of Hagen's labor inefficiency claim bars it from asserting the issue now—is that *Carter Concrete*'s facts and circumstances are markedly different from the instant case. The evidence in *Carter Concrete* supported the plausible conclusion, in the Court's view, that the plaintiff there *had* given W-T proper and timely notice of Carter Concrete's claim for additional compensation; the Court's only reservation on that point was regarding the amount of the claim in this Court as opposed to the amount of the claim communicated by Carter Concrete to W-T. Thus, the fact that W-T had not raised the issue of notice in presuit negotiations "len[t] credence to Mr. Carter's assertion in his affidavit that 'Whiting-Turner departed from and waived the notice and change order procedures otherwise required by the Subcontract.'" (Civ. No. JKB-15-1330, Mem. Mar. 4, 2016, slip op. at 10-11.) Here, the Court cannot find evidence of proper and timely notice to W-T of Hagen's labor inefficiency claim prior to the filing of this suit. As a result, that W-T did not raise the issue of notice in presuit negotiations with Hagen is unremarkable and immaterial. The Court concludes Hagen's failure to comply with the Subcontract's notice provisions on Hagen's labor inefficiency claim results in waiver of any right to assert it in this lawsuit.

### B. Signed Partial Releases

A second basis for concluding Hagen's labor inefficiency claim is barred is Hagen's execution of the Partial Releases submitted with the payment applications. In its opposition, Hagen strains to interpret the Partial Release contrary to its plain wording and to that of the main body of the Subcontract. (Pl.'s Opp'n 19-24.) First, Hagen notes the Partial Release does not apply "to extra work which Subcontractor has been authorized to proceed with by the Contractor, but for which payment has not yet been approved," and it further notes that the language in question does not itself require *written* authorization from W-T. (*Id.* 19-20.) However, remembering the rule requiring multiple documents that form a contract to be interpreted harmoniously together, the Court construes the quoted language from the Partial Release as consistent with Article 6 of the Subcontract, which addresses extra or additional work. Thus, this exception to the Partial Release's effect only applies to extra work as expressly authorized in writing by W-T pursuant to Article 6. As previously noted, Hagen has failed to show that the "extra work" that is the subject of its labor inefficiency claim was expressly authorized in writing by W-T. This argument fails.

A second argument put forth by Hagen is that the Partial Release only applies to liens, not to claims. (Pl.'s Opp'n 22-24.) Hagen's position on this point is disingenuous because it flies in the face of the plain wording of the Partial Release. It is true that the word "claim" is not in the title of the document, but Hagen cites no authority for the proposition that every critical word in a release must be contained in the release's title, and the Court knows of none. The text of the Partial Release unambiguously includes "all claims and demands against Contractor" in the release. Further, the Partial Release requires a Subcontractor's certification that the Subcontractor is aware of neither claims against the Contractor nor occurrences that could give

rise to future claims against the Contractor. And space is provided for the Subcontractor to list any exceptions to the release of claims or waiver of liens or certification as to knowledge of claims or future claims. But, as earlier noted, Hagen never listed any exceptions in any of its Partial Releases. It is, therefore, bound by its release of its labor inefficiency claim through execution of the Partial Releases without listing any exceptions.

### C.  No Damage for Delay Clause

W-T provides a third potential basis for barring Hagen's labor inefficiency claim, but the Court finds W-T's argument unmeritorious. Article 4 of the Subcontract provides,

> To the fullest extent permitted by applicable law, Contractor shall have the right at any time to delay or suspend the work or any part thereof without incurring liability therefore. An extension of time shall be the sole and exclusive remedy of Subcontractor for any delays or suspensions suffered by Subcontractor, but only to the extent that a time extension is obtained from the Owner, and Subcontractor shall have no right to seek or recover from Contractor any damages or losses, whether direct or indirect, arising from or related to any delay or acceleration to overcome delay, and/or any impact or effect of such delays on the Work.

(Subcontract 3.)

Hagen's claimed damages due to labor inefficiencies are not based upon delay. They are based upon the additional work that Hagen says was necessitated by W-T's allegedly poor management of the Project. Mere delay is not what is at issue. W-T's argument on this point is without merit.

### VI.  Conclusion

The Court concludes Hagen's labor inefficiency claim is barred by its failure to give proper and timely notice and by its execution of unqualified Partial Releases. A separate order will issue dismissing that portion of Count I. The Court also concludes that W-T's reply on its motion for partial summary judgment did not raise new issues and that Hagen's proposed

surreply is repetitive of, and only an elaboration of, its earlier opposition to W-T's motion.

Accordingly, the motion for surreply will be denied.

DATED this 4th day of February, 2019.

BY THE COURT:

_____/s/_____

James K. Bredar
Chief Judge
